# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SUE TAYLOR,
o/b/o D.T., a minor,[1]

     *Plaintiff,*

*v.*                      CASE NO. 12-CV-15098

COMMISSIONER OF           DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,          MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[2]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff's minor child, D.T., is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1]The Complaint refers to the minor plaintiff by her full name, and therefore so does the Court's docket. However, the minor should have been referred to as "D.T.," since Rule 5.2(a)(3) of the Federal Rules of Civil Procedure prohibits the use of a minor's name and requires that only a minor's initials be used.

[2]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for supplemental security income ("SSI") benefits for Plaintiff's minor child. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 12.)

Plaintiff's daughter, D.T., was nine years of age at the time of the most recent administrative hearing. (Transcript, Doc. 8 at 34, 102.) Plaintiff filed the instant claim on April 8, 2010, alleging that D.T.'s disability began on August 1, 2005. (Tr. at 102.) The claim was denied at the initial administrative stages. (Tr. at 54, 55.) In denying the claims, the Defendant Commissioner considered learning disability, attention deficit hyperactivity disorder ("ADHD"), and autism or other pervasive developmental disorders as possible bases of disability. (*Id.*) On June 17, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") JoErin O'Leary, who considered the application for benefits *de novo*. (Tr. at 10-30, 32-53.) In a decision dated July 7, 2011, the ALJ found that D.T. was not disabled. (Tr. at 26.) Plaintiff requested a review of this decision on July 19, 2011. (Tr. at 8-9.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 20, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On November 17, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531

("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. § 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. § 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in death
> or which has lasted or can be expected to last for a continuous period of not less than
> 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations . . . ." 42 U.S.C. §

5

1382c(a)(3)(C)(i). To determine whether a child's impairment results in marked and severe limitations, Social Security Administration ("SSA") regulations[3] prescribe a three-step sequential evaluation process:

1.  If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2.  If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3.  If the child's impairments are severe, the child's impairment(s) will be reviewed to determine if they meet, medically equal or functionally equal the listings. If the child has such an impairment and it meets the duration requirement, the child will be considered disabled. If the child does not have such impairment(s), or if the duration requirement is not met, the child is not disabled.

20 C.F.R. § 416.924(a). In the third step – namely, whether a child's impairment functionally equals the listings – the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). The Social Security regulations list specific impairments relevant to step three, some of which apply only to children. *Id.* § 416.924(d). A claimant bears the burden of proving that his or her impairment satisfies, or "meets," one of the listed impairments. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995); *see also Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (child's claim). Once a claimant makes such a showing, an irrebuttable presumption of disability arises and benefits must be awarded. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "A" criteria are medical findings and "B" criteria "describe

---

[3]For a history of these regulations, see *Molina v. Barnhart,* No. 00-CIV-9522(DC), 2002 WL 377529 (S.D.N.Y. March 11, 2002).

6

impairment-related functional limitations." *Id*. An impairment that shows some but not all of the criteria, no matter how severely, does not qualify. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If a child's impairments do not "meet" a listed impairment, they may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. 20 C.F.R. § 416.926a(a). A child's impairments "equal" a listed impairment when the child demonstrates a "'marked' limitation[ ] in two domains of functioning or an 'extreme' limitation in one domain." *Id*.

Domain analysis is equivalent to analysis of the "A" and "B" criteria for listed impairments and focuses on "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The regulations include six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Id*. A "marked" limitation is one which "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It "is 'more than moderate' but 'less than extreme.'" *Id.*

### D.    ALJ Findings

The ALJ applied the Commissioner's disability analysis described above and found at step one that D.T. was born on July 1, 2001, and therefore was a school-aged child on March 23, 2010, the date the application was filed, is currently a school-age child, and that she had not engaged in substantial gainful activity since March 23, 2010, the application date. (Tr. at 16.) At step two, the ALJ found that D.T.'s attention deficit hyperactivity disorder was "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that D.T.'s combination

7

of impairments met or equaled one of the listings in the regulations. (Tr. at 16-25.) Therefore, the ALJ found that D.T. was not disabled. (Tr. at 25-26.)

### E.    Administrative Record

D.T.'s first-grade teacher, Tammy Foor, completed a Teacher Questionnaire on September 24, 2008. (Tr. at 133-40.) Ms. Foor did not observe any problems in the acquiring and using information domain. (Tr. at 134.) In the attending and completing tasks domain, Ms. Foor observed slight problems on a daily basis with D.T.'s ability to pay attention when spoken to directly, to focus long enough to finish the assigned activity or task, to carry out multi-step instructions, and to complete work accurately without careless mistakes. (Tr. at 135.) She found D.T. had an obvious problem with waiting to take turns, changing from one activity to another without being disruptive, organizing her own things or school materials, and completing class/homework assignments. (*Id.*) Ms. Foor also found that D.T. had no problem sustaining attention during play or sports activities or carrying out single-step instructions. (*Id.*) Ms. Foor commented that D.T. "can do the work but chooses not to do it." (*Id.*)

In the domain of interacting and relating with others, Ms. Foor noted that D.T. has a slight problem on a daily basis with seeking attention appropriately, with expressing anger appropriately, with asking permission appropriately, and with following rules; she also has a slight problem making and keeping friends on a weekly basis. (Tr. at 136.) Ms. Foor concluded that D.T. does not have any problems relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, interpreting meaning of facial expression, body language, hints, and sarcasm, or using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation. (*Id.*) Ms. Foor observed no problems in the domain of moving about and manipulating objects. (Tr. at 137.) In the domain of caring for herself, Ms. Foor

8

observed that D.T. has a slight problem on a weekly basis in handling frustration appropriately, being patient when necessary, and an obvious problem responding appropriately to changes in her own mood. (Tr. at 138.) Ms. Foor observed a slight problem in using appropriate coping skills to meet the demands of the school environment on a daily basis. (*Id.*) Ms. Foor found no problems with personal hygiene, caring for physical needs, cooperating in or being responsible for taking needed medications, or knowing when to ask for help. (*Id.*) Ms. Foor commented that D.T. "is in Special Education for reading and math. She has been doing fine and will be exiting soon, probably in December." (Tr. at 140.)

On May 6, 2010, Karen Bradley, a teacher consultant who serves as D.T.'s case manager, completed a Teacher Questionnaire. (Tr. at 194-201.) Ms. Bradley observed that in the domain of acquiring and using information, D.T. has a slight problem comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, learning new material, and recalling and applying previously learned material. (Tr. at 195.) Ms. Bradley also concluded that D.T. has an obvious problem comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving skills in class discussions. (*Id.*) In the domain of attending and completing tasks, Ms. Bradley observed that D.T. has a slight problem on a weekly basis with paying attention when spoken to directly, sustaining attention during play/sports activities, focusing long enough to finish assigned an activity or task, carrying out single-step instructions, waiting to take turns, and changing from one activity to another without being disruptive. (Tr. at 196.) She also found that D.T. has an obvious problem on a daily basis with refocusing to task when necessary, carrying out multi-step instructions, organizing her own things or school materials, completing classroom or homework

9

assignments, completing work accurately without careless mistakes, working without distracting herself or others, and working at a reasonable pace/finishing on time. (Tr. at 196.) Ms. Bradley commented that D.T. "obtains information from visual clues/cues (other classmates)." (*Id.*)

In the domain of interacting and relating to others, Ms. Bradley observed a slight problem on a weekly basis in seeking attention appropriately, expressing anger appropriately, and following rules. (Tr. at 197.) In addition, she found that D.T. has an obvious problem on a daily basis with introducing and maintaining relevant and appropriate topics of conversation. (*Id.*) Ms. Bradley also found that D.T. has an obvious problem on a weekly basis with playing cooperatively with other children, making and keeping friends, relating experiences and telling stories, using language appropriate to the situation and listener, taking turns in a conversation, interpreting the meaning of facial expressions, body language, hints, sarcasm, and using vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (*Id.*) Ms. Bradley also found that D.T. has no problem asking permission appropriately or respecting/obeying adults in authority. (*Id.*) Ms. Bradley concluded that D.T. has no problems with moving about and manipulating objects. (Tr. at 198.) In the domain of selfcare, Ms. Bradley observed that D.T. has a slight problem on a weekly basis handling frustration properly and using good judgment regarding personal safety and dangerous circumstances, as well as an obvious problem on a weekly basis being patient when necessary, identifying and appropriately asserting emotional needs, responding appropriately to changes in her own mood, using appropriate coping skills to meet the daily demands of the school environment, and knowing when to ask for help. (Tr. at 199.) Ms. Bradley commented that D.T. is "emotionally 'thin skinned', feelings can be easily hurt. She will stomp her feet and pout when upset." (*Id.*)

D.T.'s fourth-grade teacher, Candace Keinath, completed a Childhood Disability Evaluation Form on June 2, 2011. (Tr. at 229-34.) Ms. Keinath noted that D.T. was not in special education classes but was being assisted under a 504 plan and concluded that D.T. functionally equals the Listings. (Tr. at 229.) Ms. Keinath found that D.T. has a less than marked limitation in acquiring and using information as well as a marked limitation in attending and completing tasks, noting that D.T. "does maintain her daily assignment planner[,] however, she does not always follow through at the end of the day with taking unfinished work home to complete," that she "needs redirection back to the task at hand, as she is frequently distracted by others[,]" that she has a marked limitation in interacting and relating with others because she "is easily frustrated to the point of tears or physically removing herself from the classroom when her overtures are rebuffed[,]" that "[i]t is sometimes difficult for her to accept constructive criticism[,]" and that she "has no close friends within the classroom." (Tr. at 231.) Ms. Keintah also found D.T. has a less than marked limitation in the domain of selfcare, noting that she is "well kept and appropriately dressed" but "does need frequent reminders to come to class equipped [sic] with a pencil, textbooks and assignments," that she "visits her locker often to find necessary items," and that "[h]er desk needs to be better organized." (Tr. at 232.) There were no health and physical well-being limitations noted.

At the request of Disability Determination Services ("DDS"), D.T. was examined by Michael Brady, Ph.D., on December 30, 2008. (Tr. at 318-23.) Dr. Brady summarized that D.T. intellectually

> scored in the average range on the Global Abilities Scale, a combined measure of verbal and performance IQ measures. On the WISC-IV she received performance and verbal scores that were significantly different and rendered a full-scale IQ score invalid. When taking the test she appeared at times to do her best and at other times to state answers without any thought regarding the expectations or the directs for the subtest. Following the assessment the testing limits were tests [sic] and it was clear

that she could do much better on subtest in which she made very little effort during the testing. Her intellectual functioning is likely higher that what is currently being reported.

(Tr. at 322.) Dr. Brady diagnosed Attention Deficit Hyperactivity Disorder ("ADHD"), combined type; Learning Disabilities ("LD"), NOS; and assessed a GAF score of 65. (*Id.*)

On January 13, 2009, Ron Marshall, Ph.D., completed a Childhood Disability Evaluation Form and concluded that D.T.'s ADHD and LD were severe but did not meet, medically equal, or functionally equal a Listing. (Tr. at 325.) Dr. Marshall concluded that D.T. had no limitation in acquiring and using information, a less than marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, less than marked limitation in caring for herself, and no limitation in health and physical well-being. (Tr. at 327-28.)

On July 6, 2009, D.T. was examined by DDS psychologist Despina Werstine, Ph.D., who noted that "[t]here is no evidence of any thought disorder. Her thoughts appear to be organized and goal-directed." (Tr. at 346.) Dr. Werstine noted that D.T. was "somewhat energetic and she shifted frequently in her chair. She asked on several occasions if we were almost done, but she was polite about it. It was easy to see she was somewhat hyperactive and got up from her chair a couple of times to walk over to the evaluator to look at her laptop." (*Id.*) Dr. Werstine noted that although "[h]er mother states that the 'people at school have diagnosed [D.T.] as having Asperger's Disorder[,]' [t]here is nothing in her chart regarding this diagnosis, and there was no evidence of that during this evaluation." (Tr. at 347.) Dr. Werstine diagnosed ADHD, combination type, assessed a GAF score of 65, and a fair prognosis, stating that "[w]ith the proper guidance and instruction, taking into consideration her ADHD, she should be able to perform well enough in school to hopefully achieve her true potential." (*Id.*)

On July 17, 2009, Robert Newhouse, M.D., completed a Childhood Disability Evaluation Form and concluded that D.T.'s ADHD and LD were severe but did not meet, medically equal, or functionally equal a Listing. (Tr. at 337.) Dr. Newhouse concluded that D.T. had a less than marked limitation in acquiring and using information, a marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating with others, no limitations in moving about and manipulating objects, no limitation in caring for herself, and no limitation in health and physical well-being. (Tr. at 339-40.) Dr. Newhouse noted that he had "been unable to contact the teacher to address the observations on the teacher form." (Tr. at 342.)

At the administrative hearing, D.T. testified that she was in fourth grade, that her teacher was Mrs. Keinath, and that they got along well. (Tr. at 36.) When asked what is her favorite thing in school, D.T. responded, "language arts." (*Id.*) D.T. further testified that she likes it best because it's "mostly writing" and she likes to write stories. (Tr. at 37.) D.T. indicated that the only thing she does not like about school is math because "it's a little complicated." (*Id.*) D.T. stated that she has not been disciplined at school, such as detention or time outs, and that she lives with her sister, brother, mom and dad, and that she and her sister are twins. (Tr. at 37-38.) D.T. also stated that they have pet bunnies and dogs. (Tr. at 38.) D.T. indicated that she likes to play softball and that she does dishes and whatever else she's told to do. (Tr. at 39.)

D.T.'s mother, Sue Taylor, testified that D.T.'s "teachers indicate she's having some trouble paying attention for sure." (Tr. at 40.) When asked whether she had considered medication for D.T., Mrs. Taylor responded that they "thought about it but we kind of would like to wait and see if they grew out of it a little bit - - before - - . . . ." (*Id.*) When the ALJ asked whether both daughters are having this trouble, Mrs. Taylor responded in the affirmative and indicated that her other daughter "does a little better." (*Id.*) Mrs. Taylor stated that at home her daughters "can't

13

stand still. They're just always up doing stuff and it's hard for them to concentrate like doing the dishes. She'll do them for a while and then something will catch her eye or something or her sister or something and then she'll just take off and go do something else." (Tr. at 41.) When asked whether she has talked to D.T.'s pediatrician about it, Mrs. Taylor responded, "No, not much, no." (*Id.*) Mrs. Taylor further testified that she speaks with D.T.'s teacher "quite often" because her daughters "had a lot of problem with turning homework in and getting assignments home and then taking them back to school so it was almost a weekly thing with the teachers." (*Id.*) Mrs. Taylor explained that "[t]hey have a daily planner that they do every day and then the teacher will sign it but then she goes out to her locker and she'll put it in her locker and leave it there and not bring it home." (Tr. at 48.)

When asked whether she noticed these problems before school or whether the behavior was new, Mrs. Taylor responded, "Yeah, I noticed it kind of before that they were, you know, a lot more active because my cousin has a daughter that's five years older, or five days older and she's a lot more calmer than my girls. They were just always on the go and she would just sit there and watch them because they were just always on the go." (Tr. at 42.) Mrs. Taylor also stated that "[y]ou got to keep reminding [D.T.] to finish" a task. (*Id.*) She further indicated that D.T. does not get in trouble in school other than for not paying attention or bothering other kids when she "gets up and walks around[.]" (*Id.*) When asked what accommodations or strategies D.T.'s teachers use in the classroom, Mrs. Taylor explained that "she has a bubble seat" that "helps her stay sitting" because it has "different size bubbles on it, little round discs" and "she moves around and it keeps her busy sitting down so she can do her work, but her body is still moving[.]" (Tr. at 43.) In addition, she indicated that D.T.'s teachers let her stand up to do her work if she wants to do so. (*Id.*) When asked if there were any other special accommodations given to D.T., Mrs. Taylor

14

responded, "If she happens to fall behind or doesn't quite understand it, then they'll send her down to one of the other [teachers], Mrs. Bradley or Mrs. Sherman. That helps her out." (Tr. at 43-44.) Mrs. Taylor clarified that Mrs. Bradley is D.T.'s case manager at school and Mrs. Sherman is "one of the special ed teachers." (Tr. at 44.) When asked how often D.T. is placed in the special ed classroom, Mrs. Taylor stated "[n]ot very much now" because she receives accommodations in the mainstream classroom instead. (Tr. at 44-45.) When asked how often D.T. "has to sit in the hallway" because she "just gets so worked up and starts crying[,]" Mrs. Taylor responded, "Not very often. It's usually when there's another argument with one of the other students and she just can't handle it and breaks down." (Tr. at 45.) Mrs. Taylor also indicated that D.T.'s report card stated that D.T. was going to be promoted to fifth grade next year. (Tr. at 48.) When asked by counsel, Mrs. Taylor stated that D.T was going to summer school this summer and that she had previously been tutored for one hour after school for two days per week by Mrs. Bradley for reading and math. (Tr. at 50.)

Mrs. Taylor also indicated that D.T. and her sister get along "pretty good. They argue every once in awhile." (Tr. at 46.) Mrs. Taylor indicated that D.T. "does pretty good" with her own hygiene but that she helps her with her hair. (Tr. at 47.) Mrs. Taylor indicated that D.T. does not have any physical health problems. (Tr. at 47-48.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's child disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 10.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ erred as a matter of law by failing to properly evaluate the medical records and opinion evidence, i.e., that "complete deference should not be given to the doctors" because they were "contradicted by [the minor's] teacher [Ms. Keinath] and case manager, Mrs. Bradley." (Doc. 10 at 8-9.) The Commissioner responds that "[t]eachers are not 'acceptable medical sources' and their opinions are not treated as 'medical opinions.'" (Doc. 12 at 12.)

"Functional equivalence is determined by 20 C.F.R. § 416.926a, which requires a 'marked' impairment in two 'domains' or an 'extreme' impairment in one domain." *Kelly v. Comm'r of Soc. Sec.,* 314 F. App'x 827, 829 (6th Cir. 2009) (quoting 20 C.F.R. § 416.926a(d)). An extreme limitation is defined as one that "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" and that is "more than marked." 20 C.F.R. § 416.926a(e)(3).

Here, the ALJ concluded that D.T. had a marked limitation in only one domain. Specifically, the ALJ found that D.T. had a less than marked limitation in acquiring and using information, a marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating to others, no limitation in moving about and manipulating objects, and

a less than marked limitation in the ability to care for herself. (Tr. at 21-24.)  I suggest that the ALJ's findings are supported by substantial evidence.

First, I note that D.T. is no longer in special education classes but instead receives, at times, some special services while remaining in the mainstream classroom. (Tr. at 42-45, 229.) In addition, only one of the teachers, Ms. Keinath, found D.T. had a marked limitation in more than one domain or was otherwise disabled. The ALJ's decision is supported by the opinions of all the other teachers and evaluators in the record, i.e., Dr. Brady (Tr. at 318-23), Dr. Marshall (Tr. at 325-28), Dr. Werstine (Tr. at 346-47), Dr. Newhouse (Tr. at 337-42), and Ms. Bradley. (Tr. at 195-98.)

Contrastingly, Ms. Keinath found D.T. had a marked limitation in attending and completing tasks and interacting and relating with others. (Tr. at 231.) The ALJ also found that D.T. had a marked limitation in attending and completing tasks. (Tr. at 22.) However, as to Ms. Keinath's conclusion that D.T. also has a marked limitation in interacting and relating with others, I suggest that the ALJ's divergence of opinion is supported by substantial evidence.

Ms. Keinath concluded that D.T. had a marked limitation in interacting and relating with others because she "is easily frustrated to the point of tears or physically removing herself from the classroom when her overtures are rebuffed[,]" that "[i]t is sometimes difficult for her to accept constructive criticism[,]" and that she "has no close friends within the classroom." (Tr. at 231.) Even if this were so, D.T. testified that she has never been seriously disciplined at school, i.e., she has never been sent to detention or placed in time outs. (Tr. at 37-38.) In addition, D.T.'s behavior did not require any prescription medication.  D.T.'s mother indicated that she and her husband had considered medication for D.T. but decided against pursuing it because they wanted to wait and see if she "grew out of it." (Tr. at 40.) Moreover, as noted by the ALJ, even D.T.'s mother's

17

testimony supports a finding that D.T. does not have a marked limitation in interacting and relating to others because she gets along with others. (Tr. at 23, 36, 46.)

The underlying findings of D.T.'s teachers also support the ALJ's finding in the domain of interacting and relating with others. Ms. Foor noted that D.T. has only a slight problem on a daily basis with seeking attention appropriately, expressing anger appropriately, asking permission appropriately, and following rules, and has a slight problem on a weekly basis making and keeping friends. (Tr. at 136.) Ms. Foor concluded that D.T. does not have any problems relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, interpreting the meaning of facial expressions, body language, hints, sarcasm, or using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (*Id.*)

Mrs. Bradley observed only a slight problem on a weekly basis seeking attention appropriately, expressing anger appropriately, and following rules. (Tr. at 197.) In addition, she found that D.T. had an obvious problem on a daily basis with introducing and maintaining relevant and appropriate topics of conversation. (*Id.*) Ms. Bradley also found that D.T. had an obvious problem, on a weekly basis, with playing cooperatively with other children, making and keeping friends, relating experiences and telling stories, using language appropriate to the situation and listener, taking turns in a conversation, interpreting the meaning of facial expressions, body language, hints, sarcasm, and using vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (*Id.*) Ms. Bradley also found that D.T. had no problem asking permission appropriately or respecting/obeying adults in authority. (*Id.*) Even more importantly, neither Ms. Bradley nor any other teacher found that D.T. had a serious or very serious problem in the underlying activities in this or any other domain.

Finally, I suggest that there can be no error for the ALJ's reliance on the opinions of the doctors despite the fact that they may have been contradicted by the opinions of D.T.'s "teacher [Ms. Keinath] and case manager, Mrs. Bradley." (Doc. 10 at 8-9.) As noted by the Commissioner, teachers and case managers are not treating sources entitled to any deference, whereas psychologists are treating sources and therefore are entitled to deference. 20 C.F.R. § 404.913(d)(2); 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 404.1502; SSR 06-03p, 2006 WL 2329939, at *1-2 (2006); *Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 427 (6th Cir. 2012) (the minor's "teachers are not acceptable medical sources").

**3.    Conclusion**

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

**III.    REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan*,

474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
Dated: August 8, 2013                United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  August 8, 2013                By     s/Patricia T. Morris
                                           Law Clerk to Magistrate Judge Binder